**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

In re

**HINESLEY FAMILY LIMITED**            Case No.  **10-61822-11**
**PARTNERSHIP NO. 1**,

Debtor.

## MEMORANDUM of DECISION

At Butte in said District this 28th day of February, 2011.

In this Chapter 11 bankruptcy, after due notice, the Court held a hearing on January 4,

2011, in Butte on the Motion to Appoint Case Trustee filed by Charles Hinesley, Jr. on November

24, 2010.  Creditors West Jordan, LLC ("West Jordan") and GCL Investments, LLC ("GCL")

joined in Charles Hinesley, Jr.'s Motion.  Charles Hinesley, Jr. was represented at the hearing by

Jory C. Ruggiero of Bozeman, Montana; Debtor was represented at the hearing by James A.

Patten of Billings, Montana; and GCL Investments, LLC and West Jordan, LLC were represented

at the hearing by Robert K. Baldwin and Trent M. Gardner of Bozeman, Montana.  Charles

Hinesley, Sr. and Morgan Hinesley ("Morgan") testified; Charles Hinesley, Jr.'s Exhibits 2, 6 and

10[1], West Jordan's Exhibit A and Debtor's Exhibits A and B were admitted into evidence.  After

hearing witness testimony, the Court granted the parties until January 25, 2011, to file

simultaneous briefs, after which time the matter would be deemed submitted and ready for

---

[1] Charles Hinesley, Jr.'s counsel referenced Exhibit 5 during his examination of witnesses, but did not offer Exhibit 5 into evidence.  Charles Hinesley, Jr.'s counsel also did not move for the admission of Exhibit 10.  However, Debtor's counsel asked that Exhibit 10 be admitted into evidence.

1

decision.  Charles Hinesley, Jr., Debtor, West Jordan and GCL timely filed their briefs and the

matter is deemed submitted and ready for decision.  The Motion to Appoint Case Trustee is denied

without prejudice for the reasons discussed below.

BACKGROUND

In August 1997, Charles Hinesley Sr., Judith Hinesley, Charles Hinesley Jr. and Morgan

Hinesley formed the Debtor, Hinesley Family Limited Partnership No. 1.  Debtor is a limited

partnership with three limited partners, each holding a 30% interest in the Debtor:  Judith Hinesley

(wife and mother), Charles Hinesley, Jr. (son) and Morgan (son).  Charles Hinesley Sr. owns a

10% interest in the Debtor and is the sole general partner.  Debtor has historically been engaged in

the development of raw land into subdivisions and the construction of single and multi-family

residential structures.

Since inception, Charles Hinesley Sr., as general partner and consistent with Debtor's

Agreement of Limited Partnership, has controlled nearly every aspect of the Debtor's finances.

However, Charles Hinesley Sr. concedes that he failed to maintain the accounting required by

Article III of the August 6, 1997, "Agreement of Limited Partnership."  Debtor's Exhibit A.

Instead, Charles Hinesley Sr. used the Debtor as a personal bank account from which he paid not

only the Debtor's expenses, but also family expenses, including personal automobile payments,

fuel, home mortgage payments, residential heating bills, electrical bills, insurance premiums, cell

phone bills, and a home maid for Morgan.  Charles Hinesley Sr. also caused the Debtor to make

substantial contributions to charities.  Charles Hinesley Sr. has also exercised sole discretion over

the disbursal of spending money to the other partners.

Debtor purchased land and sought to develop Laurel Glen Subdivision, Phases 1, 2, 3 and

2

4.  Debtor completed Phases 1 and 2.  Debtor entered into agreement with GCL and West Jordan

to sell lots to GCL and West Jordan in Phase 3 of Lauren Glen Subdivision at a set price.  For

various reasons discussed at the hearing, Debtor did not secure final plat of either Phase 3 or 4 of

the Laurel Glen Subdivision.  Thus, GCL and West Jordan have not been able to purchase the lots,

even though GCL and West Jordan paid Debtor to have such an option.  Debtor was in litigation

with GCL and West Jordan prepetition because of its inability to sell lots to GCL or West Jordan

under Debtor's respective agreements with the parties.  Interestingly, Charles Hinesley, Sr. owns a

one-half interest in GCL.  Charles Hinesley, Sr. explained at the hearing that the two other

partners in GCL, and not Charles Hinesley, Sr., made the decision to file suit against Debtor.

However, Charles Hinesley, Sr. did not dispute that he stands to gain personally if GCL is

successful in its action against Debtor.

In addition to Debtor's legal disputes with GCL and West Jordan, relations among at least

two of the Debtor's partners began deteriorating and in December of 2008, Charles Hinesley Jr.

filed an action against the Debtor and Charles Hinesley Sr. in the Montana Eighteenth Judicial

District Court, Gallatin County, seeking damages, dissolution of the Debtor and/or disassociation

of Charles Hinesley, Sr.  On December 31, 2008, the state court entered an order that reads in part:

> Pending the resolution of this dispute, the Partnership shall make no
> monetary partnership distributions to any partner.  The Partnership may hire any of
> the partners as employees to the extent that such employment is deemed
> appropriate by the Partnership, with the express requirement that Plaintiff Charles
> W. Hinesley, Jr. shall be offered employment with the Partnership for salary and
> other benefits that are at least equal to the salary and benefits offered to his brother
> Morgan Hinesley, in connection with his employment with the Partnership.

Charles Hinesley, Jr.'s Exhibit 10.  After entry of the December 31, 2008, state court order, the

matter was referred to an arbitrator for resolution on the merits.

Following entry of the state court order in December of 2008, Charles Hinesley, Sr.

testified that Charles Hinesley, Jr. was offered employment at the rate of $6,000 per month

performing various jobs.  Charles Hinesley, Jr. worked from April 2009 to September 2009.

Charles Hinesley, Sr. concedes that Debtor was subsequently ordered to pay Charles Hinesley, Jr.

the sum of $18,000 because Debtor had, after entry of the December 31, 2008, order, paid Morgan

$18,000 but had not paid Charles Hinesley, Jr. such amount.  Charles Hinesley, Sr. also

acknowledged at the hearing that his salary from the Debtor was $50,000 annually from 1997

through 2008.  For 2009, Charles Hinesley, Sr. increased his salary to $120,000 and he once again

increased his salary in 2010 to $180,000 annually.[2]  Under the Agreement of Limited Partnership,

Charles Hinesley, Sr., as general partner, has the authority to make management decisions,

including fixing the compensation paid to Debtor's employees.  Charles Hinesley, Sr. contends

that the increase in his salary in 2009 and 2010 was consistent with his authority under the

Agreement of Limited Partnership.  Charles Hinesley, Sr. also testified that he and his sons

discussed increasing Charles Hinesley, Sr.'s salary in prior court proceedings, and Charles

Hinesley, Sr. claims he heard no opposition from Charles Hinesley, Jr.

In September of 2009, both Charles Hinesley, Jr. and Morgan's employment with the

Debtor was terminated.  Charles Hinesley, Sr. acknowledges that he told the state court arbitrator

that he terminated Morgan and Charles Hinesley, Jr.'s employment with Debtor on September 9,

2009, for financial reasons.  Charles Hinesley, Sr. contends now that Charles Hinesley, Jr.'s verbal

abuse is what really prompted his termination on September 9, 2009.  After September of 2009,

---

[2]  Charles Hinesley, Sr. responded to an interrogatory on or about April 1, 2010, indicating
that he increased his salary to $180,000 in 2010.  While testifying, Charles Hinesley, Sr. stated
that he only contemplated increasing his salary to $180,000 in 2010, but later determined "that it
was not economically feasible to do that."

Morgan testified that he continued to receive $6,000 per month.  However, rather than receiving

the $6,000 directly from the Debtor as wages, Morgan received the $6,000 in the form of a gift

from his father, Charles Hinesley, Sr.  Charles Hinesley, Sr. testified that he increased his salary in

2009 so he could continue to pay Morgan, through gifting, and to offset the personal distributions

he was now prohibited from taking from the Debtor as a result of the state district court order.

Charles Hinesley, Jr. challenged Charles Hinesley's new payment arrangement and on June 29,

2010, an arbitrator entered an order which reads in part:

> 3.      Plaintiff's Motion for Sanctions to the extent it seeks an order that the
> Partnership pay to Plaintiff and amount equal to the amount received by Morgan
> Hinesley beginning October of 2009 is GRANTED and it is hereby ORDERED
> that the Partnership pay to Plaintiff the sum of $38,200.00 (without interest and
> without any withholding or deductions) within 30 days of the date of this Order.
> Following the termination of the written Employment Agreement between the
> partnership and Morgan Hinesley, Morgan Hinesley has continued to work for the
> Partnership and generally perform what had been his contractual obligations under
> the written agreement.  Based on the financial information provided by the
> Defendants with their counsel's letter of May 28, 2010, it appears that Morgan
> Hinesley has generally been receiving an average of approximately $6,000 per
> month which is the same amount of compensation to which he was entitled under
> the written Employment Agreement.  I conclude, therefore, that Morgan Hinesley
> has simply continued to be employed by the Partnership beginning October 2009
> without Plaintiff's also having been offered continuing employment with the
> Partnership for a salary and benefits that are at least equal to the salary and
> benefits made to Morgan Hinesley as required by the Court's Order dated
> December 31, 2008, and Order which remains the law of this case *pendente lite*
> unless and until rescinded or modified.
>
> The Arbitrator recognizes that the monies paid to Morgan Hinesley appear
> to have been paid by the General Partner ostensibly as "gifts," but from funds the
> General Partner has received from the Partnership as at least a portion of his
> declared salary, and that Morgan Hinesley claims to be working for the
> Partnership full time for nothing and simply relying on the largess of the General
> Partner.  The Arbitrator concludes, however, that this arrangement does not show
> compliance with the Court Order but rather betrays an attempt to circumvent it
> (much as did Defendants' earlier proposal to enter into a development agreement
> with an entity wholly owned by Morgan Hinesley, a proposal which was rejected
> by the Arbitrator).

5

It is further ORDERED that so long as Morgan Hinesley continues to work for the Partnership and receive Partnership funds, whether directly or indirectly through the General Partner, the Partnership shall pay Plaintiff the same amounts and at the same time as paid to Morgan Hinesley and until such time as Plaintiff is offered employment with the Partnership at least equal in salary and benefits to that being engaged in or which might later be offered to or engaged in by Morgan Hinesley.

Charles Hinesley Jr. Exhibit 2.

The arbitrator also found in the June 29, 2010, order that ". . . . many of Defendants' discovery responses are nonresponsive, incomplete, evasive and/or inadequate . . . ." Thus, in addition to the payment of $38,200 due on or before July 29, 2010, the arbitrator ordered the Debtor and Charles Hinesley, Sr. to make full, complete and comprehensive discovery responses to Charles Hinesley, Jr. by July 29, 2010.

Rather than pay Charles Hinesley, Jr. the $38,200 and prior to providing full, complete and comprehensive discovery responses as directed, Charles Hinesley, Sr. caused the Debtor to file a voluntary Chapter 11 bankruptcy petition on July 27, 2010. Debtor asserts that the cause of the bankruptcy was several-fold:

> First, the Bozeman, Montana residential real estate industry suffered a severe downturn starting in 2008. Sales were depressed and values were depreciating. The DIP suffered a loss of liquidity as a result. Second, litigation with West Jordan impaired the DIP's ability to liquidate its condominium units; West Jordan filed a lispendens on the condominium buildings which prevented the ordinary sales of the individual condominium units within each building. Consequently not only was liquidity further compromised but the DIP was unable to service the construction financing incurred in building the condominium units. The construction lender, Sterling Savings Bank threatened foreclosure. Third, litigation with limited partner Charles Hinesley Jr. threatened the DIP's ability to continue operations; an arbitration order entered on behalf of Charles Hinesley Jr. required he be paid whatever compensation was received by his brother and fellow limited partner, Morgan Hinesley. However, Charles Hinesley Jr. provided no labor or service to the DIP whereas Morgan Hinesley provided necessary labor.

Disclosure Statement, Docket Entry No. 63, pp 12-13. West Jordan disputes that it was a

6

contributing factor to Debtor's bankruptcy filing.

Debtor's Disclosure Statement also shows that Debtor sustained losses of $278,506 in 2009 and Debtor's expenses in 2010 exceeded its income by $361,385. Notwithstanding Debtor's financial condition, Charles Hinesley, Sr. testified that he continued to pay personal expenses out of the Debtor's accounts. For example, Charles Hinesley, Sr. tithed $2,500 to the Gallatin County Presbyterian Church on January 10, 2010, and paid $1,000 to Bozeman Deaconess Hospital on account of Charles Hinesley, Sr.'s wife, Judith Hinesley. Charles Hinesley, Sr. testified that even though he has a personal checkbook, it was just easier to pay for personal expenses using the Debtor's check book.

Charles Hinesley, Sr. also testified that he and Morgan sought and obtained permission from this Court to pay themselves $10,000 and $6,000 per month, respectively, from Debtor's accounts during the pendency of this bankruptcy. Not coincidentally, $6,000 per month is the same amount that the arbitrator recently determined that Debtor and Charles Hinesley, Sr. were paying to Morgan in violation of the state district court's order. Until just prior to the January 4, 2011, hearing, this Court was not aware of the state district court order precluding exactly this type of payment.

Charles Hinesley, Sr. also testified that the attachments to Debtor's Disclosure Statement, specifically Appendix B, show that Debtor's general unsecured claims total $24,821. However, Charles Hinesley, Sr. conceded at the hearing that Debtor owes Charles Hinesley, Jr. $38,000 and owes Debtor's prior counsel, Buzz Tarlow, $18,000.[3] The foregoing two claims alone clearly

---

[3] Buzz Tarlow was the attorney who first represented the Debtor in the litigation with Charles Hinesley, Jr. Charles Hinesley, Sr. terminated Buzz Tarlow when Debtor was apparently unable to pay Mr. Tarlow's legal bill. Charles Hinesley, Sr. explained that when he later got funds, he hired a new attorney instead of paying Mr. Tarlow.

exceed $24,821.

When asked at the January 4, 2011, hearing about whether the Debtor intends to show as much respect for this Court's orders as it has for the orders of the Eighteenth Judicial District Court of Montana, Charles Hinesley, Sr. responded that "I've always felt that we honored those requests and have never been found not in compliance."

By separate Order, the Court has granted Debtor authority to sell three condominiums for $115,000 each.  The three condominiums are part of eight condominiums that Debtor borrowed $733,000 to build.  Dividing $733,000 by eight reveals that it cost Debtor roughly $91,625.00 to build each of the eight aforementioned condominiums.  The figure of $91,625 does not include the costs Debtor incurred purchasing and developing the raw land on which the condominiums sit.

### APPLICABLE LAW

The appointment of a trustee in a Chapter 11 case is provided for in 11 U.S.C. § 1104(a), which provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
> >
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> >
> > (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

The subsections of § 1104(a) are in the disjunctive.  Therefore, a trustee may be appointed

if any of the independent subsections of § 1104(a) are satisfied.  *In re Lowenschuss*, 171 F.3d 673,

685 (9th Cir. 1999).

DISCUSSION

This case is troubling because it is clear that, contrary to the state district court order and

the order of the arbitrator, Charles Hinesley, Sr. is continuing to distribute money not only to

himself, but also to Morgan in the form of wages.  It is plainly evident that Charles Hinesley, Sr.

sees Debtor's bankruptcy as a means to circumvent the state district court order regarding

distributions and payment of wages.  However, notwithstanding the foregoing, the Court is not

convinced at this time that an independent trustee is needed to evaluate and administer this case,

particularly as Debtor's assets, consisting primarily of real estate, are not easily susceptible to loss,

and where the Court and parties have the ability to closely monitor Debtor's cash outlays.

The active parties in this case, along with their attorneys, have the wherewithal to review

and evaluate Debtor's Amended Disclosure Statement and Amended Chapter 11 Plan filed

February 7, 2011, and determine whether Debtor's proposed plan is feasible.  All parties,

including Debtor's counsel, are undoubtedly cognizant that while a reorganization plan's

"[s]uccess need not be guaranteed", there must be a reasonable prospect for success.  *Clarkson v.*

*Cooke Sales and Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) followed by *In re*

*Henke,* 90 B.R. 451, 456 (Bankr. D. Mont. 1988).  *In re Roberts Rocky Mountain Equip. Co., Inc.*,

76 B.R. 784, 790 (Bankr. D. Mont. 1987), *In re Great N. Recreation Center, Inc.*, 74 B.R. 846,

852 (Bankr. D. Mont. 1987) and *In re Martin*, 66 B.R. 921, 925 (Bankr. D. Mont. 1986), hold that

feasibility determinations must be "firmly rooted in predictions based on objective fact."  The

debtor bears the burden of establishing the feasibility of its plan by a preponderance of the evidence. *In re Euerle Farms Inc.*, 861 F.2d 1089, 1091-92 (8th Cir. 1988). As explained in *In re Hobble Diamond Cattle Co.*, 89 B.R. 856, 858 (Bankr. D. Mont 1988):

> Speculative, conjectural or unrealistic predictions cannot be used to predict financial progress. *In re Stuart Motel, Inc*., 8 B.R. 48 (Bankr. S.D.Fla. 1980). Factual support must be shown for the Debtors' projections. *In re Reilly*, 71 B.R. 132, 4 Mont. B.R. 150, 155 (Bankr. Mont 1987).

Consistent with the foregoing, Debtor will have to show in short order that its plan is not purely visionary or speculative, but rather, that the plan is grounded in historical reality. Debtor will not be permitted to put the financial risk of its plan on the backs of the creditors. The Court and indeed the parties, particularly West Jordan, GCL and Charles Hinesley, Jr., will certainly scrutinize Debtor's proposed amended plat to ascertain whether Debtor has a realistic plan of how to repay its creditors going forward, especially when Debtor could not accomplish such task in the past.

Debtor sustained losses in 2009 and 2010. Debtor's monthly operating reports filed January 14, 2011, and February 14, 2011, show that Debtor's gross sales were $125,824 in November 2010, $13,571 in December 2010 and $10,847 in January 2011. Debtor's cost of goods sold were $74,476 in November, $24,513 in December and $12,802 in January, leaving Debtor with a positive gross profit of $51,348 in November and negative gross profits of $10,942 in December and $1,955 in January. From the gross profit, Debtor paid Charles Hinesley, Sr. and Morgan $16,000 in November and December and paid Morgan $6,000 in January. Debtor also incurred general and administrative expenses of $15,593 in November, $30,149 December and $14,518 in January. In addition, Debtor has sought and obtained approval to sell three condominiums, but it remains to be seen whether Debtor will realize any profit from those sales or

10

whether Debtor's basis in those condominiums equals or exceeds the selling price of $115,000 per unit. The foregoing suggests that, to date, Debtor's cash flow may not be sufficient to service its debts which are in excess of $4 million.

While Debtor's ability to generate revenue has not been good from a historical perspective, Charles Hinesley, Sr. concedes that all creditors would be paid if Debtor's assets were liquidated. Even though Debtor could liquidate its assets and repay its creditors, Charles Hinesley, Sr. testified that Debtor's proposed plan contemplates that Debtor will take on new debt so it can continue to build and sell homes.

Debtor's proposal to take on new debt causes concern. The Court is also concerned that Charles Hinesley, Sr. and Morgan now paying themselves $16,000 per month, contrary to what the state district court previously allowed. The $6,000 monthly salary to Morgan is a direct violation of the state district court order. Moreover, the arbitrator arguably rejected Charles Hinesley, Sr. attempt to increase his own salary to $120,000 per year, finding that Charles Hinesley, Sr's effort to increase his salary so he could gift Morgan a salary "does not show compliance . . . but betrays an attempt to circumvent" the state district court's December 31, 2008, order. While the Court is not persuaded that the additional expense of a trustee is justified at this time, the Court does find it appropriate, pending confirmation of a plan, to immediately suspend the approval of any payments whatsoever to Morgan and to cap Charles Hinesley Sr.'s salary at $50,000 per year, or $4,166. 67 per month.

The Court's decision to not appoint a trustee at this time is without prejudice. The Court will not allow this case to languish. A hearing on approval of Debtor's Disclosure Statement was held January 4, 2011. At that hearing, the Court granted Debtor additional time to amend its

11

Disclosure Statement and scheduled another hearing on approval of Debtor's amended disclosure statement for March 1, 2011. As previously noted, Debtor filed an Amended Disclosure Statement on February 7, 2011. No party-in-interest has filed a timely objection to approval of Debtor's Amended Disclosure Statement. Thus, it appears very likely that Debtor's Amended Disclosure Statement will be approved on March 1, 2011. If Debtor's Amended Disclosure Statement is indeed approved on March 1, 2011, the Court will then set confirmation for April 5, 2011. Debtor will thus have approximately 35 days to convince parties-in-interest and this Court that its plan is both feasible and proposed in good faith, and that it should be permitted to proceed forward under the terms of a Chapter 11 plan.

In accordance with the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that Charles Hinesley, Jr.'s Motion to Appoint Case Trustee filed November 24, 2010, at docket entry no. 60 is DENIED without prejudice.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

12