UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**HINESLEY FAMILY LIMITED PARTNERSHIP NO. 1**,

Debtor.

Case No. **10-61822-11**

## *MEMORANDUM of DECISION*

At Butte in said District this 21st day of June, 2011.

In this Chapter 11 bankruptcy, after due notice, the Court held a hearing on June 13, 2011, in Butte on Debtor's Objection to Proof of Claim No. 2 filed by Charles Hinesley, Jr. Debtor was represented at the hearing by James A. Patten of Billings, Montana; and Charles W. Hinesley, Jr. was represented at the hearing by Jory C. Ruggiero of Bozeman, Montana. Charles W. Hinesley, Jr. ("Charles"), Petra Hinesley and Charles W. Hinesley, Sr. ("Hinesley Sr.") testified and Debtor's Exhibits 48 and 49 and Charles' Exhibits 2, 6, 10 and 23 were admitted into evidence without objection.

### BACKGROUND

In August 1997, Hinesley Sr., Judith Hinesley, Charles and Morgan Hinesley ("Morgan") formed the Debtor, Hinesley Family Limited Partnership No. 1. Debtor is a limited partnership with three limited partners, each holding a 30% interest in the Debtor: Judith Hinesley (wife and mother), Charles (son) and Morgan (son). Hinesley Sr. owns a 10% interest in the Debtor and is

1

the sole general partner.  Debtor has historically been engaged in the development of raw land into subdivisions and the construction of single and multi-family residential structures.

Since inception, Hinesley Sr., as general partner and consistent with Debtor's Agreement of Limited Partnership, has controlled nearly every aspect of the Debtor's finances.  However, Hinesley Sr. concedes that he failed to maintain the accounting required by Article III of the August 6, 1997, "Agreement of Limited Partnership."  Instead, Hinesley Sr. used the Debtor as a personal bank account from which he paid not only the Debtor's expenses, but also partner expenses, including personal automobile payments, fuel, home mortgage payments, residential heating bills, electrical bills, insurance premiums, and cell phone bills.  Hinesley Sr. also exercised sole discretion over the disbursal of spending money to the limited partners and caused the Debtor to make substantial contributions to charities.

Relations between Charles and Hinesley Sr. began deteriorating in 2008, prompting Charles to file an action against the Debtor and Hinesley Sr. in the Montana Eighteenth Judicial District Court, Gallatin County, seeking unspecified damages, dissolution of the Debtor and/or disassociation of Hinesley Sr.  On December 31, 2008, the state court entered an order that reads in part:

> Pending the resolution of this dispute, the Partnership shall make no monetary partnership distributions to any partner.  The Partnership may hire any of the partners as employees to the extent that such employment is deemed appropriate by the Partnership, with the express requirement that Plaintiff Charles W. Hinesley, Jr. shall be offered employment with the Partnership for salary and other benefits that are at least equal to the salary and benefits offered to his brother Morgan Hinesley, in connection with his employment with the Partnership.

Debtor's Exhibit 48.  After entry of the December 31, 2008, state court order, the matter was referred to an arbitrator for resolution on the merits.

Following entry of the state court order in December of 2008, Charles and Morgan were offered employment with Debtor at the rate of $6,000 per month. Morgan resumed work in January of 2009, but Charles did not return to work until April 2009 because Charles was negotiating the terms of an employment contract. Even though Charles did not work during January, February and March of 2009, Debtor was ordered to pay Charles the sum of $18,000 for said period because Morgan received wages for those months. Debtor was ordered to pay the $18,000 because, pursuant to the December 31, 2008, state court order, Morgan and Charles were to receive equal salary and benefits. Charles worked from April 2009 to September 2009, when both Charles and Morgan's employment with Debtor was terminated.

Hinesley Sr.'s salary from the Debtor was $50,000 annually from 1997 through 2008. Hinesley Sr. increased his salary to $120,000 in 2009. Hinesley Sr. responded to an interrogatory on or about April 1, 2010, indicating that he increased his salary to $180,000 in 2010. However, Hinesley Sr. testified that even though he had authorized an increase in his salary for 2010, he never actually paid himself the increased salary because "it was not economically feasible to do that." Under the Agreement of Limited Partnership, Hinesley Sr., as general partner, has the authority to make management decisions, including fixing the compensation paid to Debtor's employees. Hinesley Sr. maintains that the increase in his salary in 2009 and 2010 was consistent with his authority under the Agreement of Limited Partnership.

Hinesley Sr. represented in the state court proceeding that Morgan and Charles' employment with Debtor was terminated on September 9, 2009, for financial reasons. Hinesley Sr. contends now that Charles's verbal abuse was a contributing factor to his termination on September 9, 2009. After September 2009, Morgan continued to receive $6,000 per month.

3

However, rather than receiving the $6,000 directly from the Debtor as wages, Morgan received $6,000 in the form of a gift from his father, Hinesley Sr. Hinesley Sr. admits he increased his salary in 2009 so he could continue to pay Morgan, through gifting, and to offset the personal distributions he was now prohibited from taking from the Debtor as a result of the state district court order. Charles challenged the new payment arrangement and on June 29, 2010, an arbitrator entered an order which reads in part:

> 3. Plaintiff's Motion for Sanctions to the extent it seeks an order that the Partnership pay to Plaintiff an amount equal to the amount received by Morgan Hinesley beginning October of 2009 is GRANTED and it is hereby ORDERED that the Partnership pay to Plaintiff the sum of $38,200.00 (without interest and without any withholding or deductions) within 30 days of the date of this Order. Following the termination of the written Employment Agreement between the partnership and Morgan Hinesley, Morgan Hinesley has continued to work for the Partnership and generally perform what had been his contractual obligations under the written agreement. Based on the financial information provided by the Defendants with their counsel's letter of May 28, 2010, it appears that Morgan Hinesley has generally been receiving an average of approximately $6,000 per month which is the same amount of compensation to which he was entitled under the written Employment Agreement. I conclude, therefore, that Morgan Hinesley has simply continued to be employed by the Partnership beginning October 2009 without Plaintiff's also having been offered continuing employment with the Partnership for a salary and benefits that are at least equal to the salary and benefits made to Morgan Hinesley as required by the Court's Order dated December 31, 2008, an Order which remains the law of this case *pendente lite* unless and until rescinded or modified.
>
> The Arbitrator recognizes that the monies paid to Morgan Hinesley appear to have been paid by the General Partner ostensibly as "gifts," but from funds the General Partner has received from the Partnership as at least a portion of his declared salary, and that Morgan Hinesley claims to be working for the Partnership full time for nothing and simply relying on the largess of the General Partner. The Arbitrator concludes, however, that this arrangement does not show compliance with the Court Order but rather betrays an attempt to circumvent it (much as did Defendants' earlier proposal to enter into a development agreement with an entity wholly owned by Morgan Hinesley, a proposal which was rejected by the Arbitrator).
>
> It is further ORDERED that so long as Morgan Hinesley continues to work

4

> for the Partnership and receive Partnership funds, whether directly or indirectly through the General Partner, the Partnership shall pay Plaintiff the same amounts and at the same time as paid to Morgan Hinesley and until such time as Plaintiff is offered employment with the Partnership at least equal in salary and benefits to that being engaged in or which might later be offered to or engaged in by Morgan Hinesley.

Charles Exhibit 2.

Instead of paying Charles $38,200 within 30 days, Hinesley Sr. caused the Debtor to file a voluntary Chapter 11 bankruptcy petition on July 27, 2010. Charles proceeded to file his amended Proof of Claim on October 29, 2010, asserting a priority claim of $11,725.00 and an unsecured claim of $2,103,888. The priority portion of Proof of Claim No. 2 is for wages, salaries or commissions earned within 180 days before filing of the bankruptcy petition. Proof of Claim No. 2 is not accompanied by any itemization detailing how the amounts in the Proof of Claim were derived.

At the beginning of the June 13, 2011, hearing, counsel for Charles agreed that $1.2 million of the pending claim is attributable to Charles' 30% ownership interest in the Debtor. "Charles stipulates that the equitable request for judicial dissolution and the request for payment of his equity interest in HFLP are not proper creditor claims." Charles is thus asserting a total claim of $915,613.00. Nothing in the record indicates how Charles reached the claimed amount of $915,613, but Charles testified that his claim includes $38,200 awarded in the arbitrator's June 29, 2010, order. Charles also asserts he is owed an additional $54,000 in matching payments because Morgan received wages of $6,000 per month between May 19, 2010, and February 28, 2011. Under the state district court's order of December 31, 2008, "Charles W. Hinesley, Jr. shall be offered employment with the Partnership for salary and other benefits that are at least

5

equal to the salary and benefits offered to his brother Morgan Hinesley[.]"

Next, Charles asserts he lost his home when the temporary restraining order went into effect, forcing Charles and his wife, Petra, to sell their home through a short sale. Charles calculates this portion of his claim as $172,800, consisting of a down payment of $75,000, plus $15,000 of improvements and the sum of all payments made on the home. As a result of losing his home, Charles calculates that he sustained additional damages of $4,467 stemming from laundry charges, mail box rental and storage rental that he would not have had to pay had he been able to continue living in his home.

Charles also argues that his lack of employment and pay from the Debtor caused Charles to lose his Silverado pickup. Charles testified that the truck was repossessed in May 2010. Charles includes $27,080 of damages in his claim for loss of the truck. Such damages were calculated by adding the trade-in value of Charles' old truck of $16,000 plus $11,080 worth of payments made on the Silverado.

Charles next maintains that he lost his fifth wheel camper trailer because of the ongoing conflict between Charles and Hinesley Sr./Debtor. Charles and his spouse moved into the camper trailer after they lost their home. After the Silverado was repossessed, Charles lost the ability to move his camper trailer. The camper trailer was repossessed in August of 2010. The camper trailer was sold and the creditor is looking for a deficiency payment of $28,000. Charles calculates his damages associated with the camper trailer at $39,050 consisting of the deficiency still owing plus the sum of all payments Charles made on the trailer.

Charles also claims $150,000 in damages for loss of personal belongings, $300,000 for damage to his credit, $2,123 for loss of a telephone provided by Debtor, $125,000 for loss of

6

course of life and $250,000 for two and one-half years of emotional distress.  In sum, Proof of Claim No. 2 consists of the following alleged items of damages:

| | |
|---|---:|
| Lost wages per state district court order | $38,200 |
| 9 months of subsequent wages paid to Morgan, but not Charles | $54,000 |
| Damages associated with the loss of Charles' house | $172,800 |
| Damage for increased expenses | $4,467 |
| Loss of 2008 Silverado pickup truck | $27,080 |
| Loss of 2008 Jayco designer fifth wheel camper trailer | $39,050 |
| Loss of personal belongings | $150,000 |
| Damage to credit | $300,000 |
| Loss from use of a Debtor supplied telephone | $2,123 |
| Emotional distress | $250,000 |
| Loss of course of life | $125,000 |
| Total | $1,162,720.00 |

Charles' living situation has deteriorated since the dispute began with his father and Debtor.  However, Hinesley Sr. advised Charles, through counsel, that he and Petra could live in one of Debtor's condominiums rent free for as long as needed.  Hinesley Sr. also offered to bring Charles' truck payments current.  Charles declined both offers.

## CONTENTIONS OF THE PARTIES

Based upon the foregoing, Debtor objects to Charles' proof of claim, arguing said claim should be allowed as an unsecured nonpriority claim in the amount of $38,200.  Charles counters that in addition to the $38,200, he is entitled to $54,000 in wages for the nine month period of time between May 19, 2011, and February 28, 2010.  Charles also argues he is entitled to "the value of the damages that Charles sustained as a consequence of HFLP improperly withholding the payments mandated by the district court TRO."

## APPLICABLE LAW and DISCUSSION

Rule 3001(f), F.R.B.P., provides that a proof of claim completed and filed in accordance

7

with 11 U.S.C. § 501 and any applicable Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the claim.  Thus, if a procedurally proper claim is filed, an objecting party carries the burden of going forward with evidence contesting the validity or amount of the claim.  *In re Weber*, 16 Mont. B.R. 49, 56 (Bankr. D. Mont. 1997); *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991).

      Montana LBR 3001-2 directs that "[a] proof of claim shall include those documents required by F.R.B.P. 3001(c) and (d); and an itemized summary of the account showing, as of the date of the commencement of the debtor's bankruptcy case, the unpaid principal balance, all accrued interest, forced-placed insurance, late charges, and other charges; the rate of contract or other interest; and the per diem interest accrual as of the date of the commencement of the case."  All that is attached to Charles' proof of claim are an exhibit summary, which lists no dollar amounts, the arbitrator's June 29, 2010, Rulings and Order on Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion for Sanctions, and Charles' First Amended Complaint for Declaratory Judgment and Equitable Relief.  Charles did not attach any itemization to his proof of claim showing how he arrived at his claim of $915,613.  Given the skeletal nature of the record, Charles' Proof of Claim No. 2 is not entitled to the *prima facie* validity afforded by F.R.B.P. 3001(f).  Because Proof of Claim No. 2 is not entitled to the *prima facie* effect afforded by Rule 3001(f), the burden shifts to Charles to prove the validity of his claim by a preponderance of the evidence.  *In re Allegheny Int'l, Inc*. 954 F.2d 167, 173-74 (3rd Cir. 1992).

      Charles has proven by a preponderance of the evidence that he is entitled to his wage claims of $38,200 and $54,000 from the Debtor.  However, Charles has not demonstrated by a preponderance of the evidence the validity of the remainder of his claim.

Charles' claims against Debtor and Hinesley Sr. stem from the state court proceeding Charles commenced in December of 2008. In his first amended complaint for declaratory judgment and equitable relief, Charles sought a judicial decree that Debtor be dissolved and wound up, or, in the alternative, for a judicial decree that Hinesley Sr. be dissociated; for a judicially supervised windup and accounting of the Debtor; for enforcement of the state district court's temporary restraining order; and for unspecified damages as a result of the mismanagement of Debtor's assets. Given the nature of the relief requested and the evidence presented at the June 13, 2011, hearing, the Court cannot award Charles' his requested damages.

In *Peschel v. City of Missoula*, 664 F.Supp.2d 1149, 1159 (D.Mont. 2009), the United States District Court for the District of Montana explained: "'[A] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.' *Bass v. First Pacific Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir.2000). 'The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum.' *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir.1980). Federal courts 'are bound by the pronouncements of the state's highest court on applicable state law[,]' *Appling v. State Farm Mutual Auto. Ins. Co.*, 340 F.3d 769, 778 (9th Cir.2003) (quoting *Ticknor v. Choice Hotels International, Inc.*, 265 F.3d 931, 939 (9th Cir.2001)), and 'are generally bound by the dicta of state courts.' *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1110 n. 12 (9th Cir.2007).'"

The Supreme Court of Montana instructs that the recoverable pecuniary loss "is measured by the amount of loss recoverable in a civil action. *See* Section 46-18-243(1)(a), MCA (1997).

9

We have held that an award of speculative damages is not allowed in civil cases. *See Stensvad v. Miners and Merchants Bank of Roundup* (1982), 196 Mont. 193, 206, 640 P.2d 1303, 1310 (citation omitted)." *State v. Benoit*, 2002 MT 166, ¶ 29, 310 Mont. 449, 51 P.3d 495.

Charles and Petra's living conditions since April of 2009 have been deplorable. The testimony on this point was credible and heartbreaking. However, Charles' damage calculations do not satisfy the standard articulated in *Benoit*. For instance, Charles sold his home on or about April 30, 2009, for $295,000, which was less than the amount still owing on the mortgage. In other words, under the then existing market conditions, Charles had no equity in his home. Nevertheless, Charles seeks to extract as damages from the Debtor all monies Charles put into the home, including monthly mortgage payments that included insurance, interest and perhaps taxes. Charles has failed to show any connection between the actions of Debtor, and the resulting loss from the sale of Charles' home, particularly as Charles was working for the Debtor in April of 2009 and was eventually paid $18,000 for January, February and March 2009. Furthermore, Charles conceded that he was trying to sell his home prior to December of 2008, with the evidence suggesting that Charles and Petra were going to sell their home and travel in their fifth wheel camper trailer in pursuit of other business ventures.

The Court also cannot accept Charles' calculation of damages stemming from the loss of the Silverado pickup and the fifth wheel camper trailer. As with the house, Charles seeks to claim as damages every dollar he put into his house, pickup and fifth wheel camper trailer. Charles' methodology, however, is speculative and fails to account for depreciation and market conditions. Thus, the Court cannot accept Charles' damage calculations for the house, pickup or trailer because the Court is not persuaded by the way in which Charles calculated his damages.

10

Moreover, Charles did not support his personal, and sometimes arbitrary personal opinions of damage with independent, verifiable evidence. For example, Charles testified that he and Petra sold a $35,000 rug that Petra had owned for sometime for $1,000. Charles and Petra also sold or pawned other unidentified items of personal belongings to survive. However, Charles produced no documentation to support the claim that Debtor caused him and Petra to sell or pawn $150,000 worth of personal property. The Court is similarly not persuaded by Charles' opinion that his credit has been damaged by a figure of $300,000.

The above components of Charles' claim do not fail because of Charles' veracity, but fail because of the quantum of proof produced at the hearing. As another example, Charles' damage claim includes a component identified as emotional distress. In the context of a stay violation, an individual may establish emotional distress in several different ways, including: Corroborating medical evidence, testimony of family members, friends or coworkers as to manifestations of mental anguish which clearly establishes that significant emotional harm occurred; or, in cases where the violator engaged in egregious conduct, without corroborative evidence where the individual suffers significant emotional distress and the circumstances surrounding the violation make it obvious that a reasonable person would suffer significant emotional harm. *Dawson v. Wash. Mutual Bank*, 390 F.3d 1139 (9th Cir.2004). It must be clear that an individual suffered significant emotional harm caused by the violation of the stay to support an award for emotional distress. *Dawson*, 390 F.3d at1149. F.3d at, 1149-51.

In discussing emotional damage awards this Court noted in *Miller v. Snavely*, 19 Mont. B.R. 300, 354-55 (Bankr. D.Mont. 2002), quoting Ninth Circuit cases:

> While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in either Washington, the Ninth

11

> Circuit, or the Supreme Court. *See* [*Herring v. Dept. of Social and Health Services*, 81 Wash.App.1, 914 P.2d 67, 77-83 (Wash. Ct. App. 1996)] (upholding damage award in excess of $1,000,000, including $550,000 for emotional damages, in disability discrimination and retaliation case based on testimonial evidence of emotional harm); *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir.1985) (upholding emotional damages based solely on testimony); *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir.1994) (noting that emotional damages may be awarded based on testimony alone or appropriate inference from circumstances); *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (noting that emotional distress damages are "essentially subjective" and may be proven by reference to injured party's conduct and observations by others). *See also Merriweather v. Family Dollar Stores*, 103 F.3d 576, 580 (7th Cir.1996) (noting that plaintiff's testimony can be enough to support emotional damages).

*Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 513 (9th Cir. 2000).

In *Johnson v. Hale,* a housing discrimination case out of Billings, Montana, the Ninth Circuit wrote:

> [C]ompensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms. *Id.* at 1193 (citing *Phiffer v. Proud Parrot Motor Hotel*, 648 F.2d 1353548, 552-53 (9th Cir.1980); *Seaton v. Sky Realty Co.*, 491 F.2d 634, 636 (7th Cir.1974)). We also emphasized that "both plaintiffs provided detailed and substantial testimony to support their claims that they suffered emotional distress as a result of the Hales' discriminatory acts" and that "[t]he Hales offered no evidence to rebut this testimony."

*Johnson v. Hale*, 13 F.3d 1352–53.

In Montana, the Supreme Court has adopted a standard of proof for independent tort claims of negligent or intentional infliction of emotional distress. *Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 220-39, 896 P.2d 411, 417-29 (1995). As discussed earlier, while the record is not particularly clear, it appears Charles is alleging emotional distress

as a element of damages, making the heightened *Sacco* standard inapplicable. *See Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 185, 345 Mont. 12, 192 P.3d 186. Instead "[t]he measure of [Charles'] actual damages is a factual matter" for this Court to determine. *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶¶ 188-191, 345 Mont. 12, 192 P.3d 186. The Court therefore follows the guidance set forth in *Miller v. Snavely,* 19 B.R. 300.

      The dispute between Hinesley Sr. and Debtor, on the one hand, and Charles, on the other, is at its core, a family dispute. The Court can appreciate that Hinesley Sr. is, in Charles' eyes, a controlling and manipulative father. The Court can similarly appreciate that Hinesley Sr. might perceive Charles as a contumacious and obstinate son who wants to reject a father's dominance by establishing a life independent and separate from his father, brother and the Debtor. Charles' stubborn and principled attitude is best reflected in his rejection of Hinesley Sr.'s offer of a condominium to live in, rent free, and rejection of Hinesley Sr.'s offer to bring Charles' truck payments current. Based upon the facts presented, the Court cannot conclude that Charles' emotional distress is the natural and direct result of actions taken by Hinesley Sr. and Debtor.

      Unfortunately, the parties in this case are involved in a ugly family dispute that appears to have no happy ending. To that end, Charles has not demonstrated by a preponderance of the evidence that he is entitled to anything more than an unsecured nonpriority claim of $92,200. Assumptions, ballpark figures and purely speculative opinions are insufficient information upon which this Court can base a proof of claim. For the reasons discussed above, the Court will enter a separate order providing as follows:

      IT IS ORDERED Debtor's Objection to Proof of Claim No. 2 filed by Charles Hinesley, Jr. is sustained in part and overruled in part; and Proof of Claim No. 2 filed by Charles Hinesley,

Jr. shall be allowed as an unsecured nonpriority claim in the amount of $92,200.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana